IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| BLUE WATER BALTIMORE, INC. | ) | |
| 2631 Sisson Street | ) | |
| Baltimore, MD 21213 | ) | |
| (Baltimore City); | ) | |
| | ) | |
| NATURAL RESOURCES DEFENSE COUNCIL, | ) | |
| INC. | ) | |
| 40 West 20th Street, 11th Floor | ) | Civil Action No. 17-cv-1253 |
| New York, NY 10011; *and* | ) | |
| | ) | |
| AMERICAN RIVERS | ) | |
| 1101 14th Street NW, Suite 1400 | ) | |
| Washington, DC 20005, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SCOTT PRUITT, in his official capacity as | ) | |
| Administrator of the U.S. Environmental Protection | ) | |
| Agency | ) | |
| William Jefferson Clinton Building | ) | |
| 1200 Pennsylvania Avenue NW | ) | |
| Washington, DC 20460; | ) | |
| | ) | |
| CECIL A. RODRIGUES, in his official capacity as | ) | |
| Acting Regional Administrator for Region III of the | ) | |
| U.S. Environmental Protection Agency | ) | |
| 1650 Arch Street | ) | |
| Philadelphia, PA 19103; *and* | ) | |
| | ) | |
| U.S. ENVIRONMENTAL PROTECTION | ) | |
| AGENCY | ) | |
| William Jefferson Clinton Building | ) | |
| 1200 Pennsylvania Avenue NW | ) | |
| Washington, DC 20460, | ) | |
| | ) | |
| *Defendants*. | ) | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

INTRODUCTION

1.      This lawsuit challenges the U.S. Environmental Protection Agency's decision to duck a question the Clean Water Act requires the agency to answer: whether stormwater discharges that are polluting a Baltimore-area watershed are subject to the Act's permitting regime.

2.      Stormwater runoff is one of the most significant sources of water pollution in the nation. It is a leading source of water pollution in the Baltimore area.

3.      The Clean Water Act requires the U.S. Environmental Protection Agency, along with Administrator Scott Pruitt and Acting Regional Administrator for Region III Cecil A. Rodrigues (collectively, EPA), to protect Maryland waterways from pollutants that are harmful to human and ecological health.

4.      If EPA determines that a category of stormwater discharges contributes to a violation of water quality standards or is a significant contributor of pollutants to waters of the United States, the Act requires that those discharges be regulated by a permit.

5.      Members of the public who believe that a category of discharges should be regulated need not wait for EPA to make the determination on its own. Rather, the agency's regulations empower the public to petition EPA to make the finding that triggers the obligation to permit. EPA must "make a final determination" in response to any such petition.

6.      Blue Water Baltimore, Natural Resources Defense Council, and American Rivers (collectively, Blue Water Baltimore) petitioned EPA in 2015 for a determination that stormwater discharges from commercial, industrial, and institutional sites are contributing

to water quality standard violations in the Back River watershed, and therefore require Clean Water Act permits.

7.      EPA responded to Blue Water Baltimore's petition in November 2016. The agency's response did not include the final determination its own regulations require—that is, EPA did not reach any conclusion about the impact of the referenced discharges on the Back River. Rather, the agency denied the petition based on a policy preference to address stormwater pollution in a different way.

8.      The Clean Water Act does not give the agency the option not to decide. Blue Water Baltimore's petition triggered a mandatory duty for EPA to conclude either that: (1) the referenced discharges are contributing to a violation of water quality standards, and require permits; or (2) the referenced discharges are not contributing to a violation of water quality standards, and do not require permits.

9.      EPA's denial of Blue Water Baltimore's petition was an arbitrary and capricious final agency action, and was unlawful under the Administrative Procedure Act. EPA denied the petition based on other programs that the Clean Water Act does not authorize the agency to consider, and that in any event do not support EPA's conclusion.

10.     Blue Water Baltimore seeks declaratory and injunctive relief for EPA's failure to act or unlawful denial, and asks this Court to direct the agency to make a final determination, using the correct statutory criteria, whether the discharges at issue contribute to violations of water quality standards and therefore require Clean Water Act permits.

PARTIES

11.     Plaintiff Blue Water Baltimore is a local, nonprofit organization with over 650 members. Blue Water Baltimore seeks to restore the quality of Baltimore's rivers,

3

streams, and harbor to foster a healthy environment, a strong economy, and thriving communities.

12.    Plaintiff Natural Resources Defense Council (NRDC) is a national, nonprofit environmental and public-health organization with hundreds of thousands of members. NRDC engages in research, advocacy, media, and litigation to protect public health and the environment. A clean water supply—with rivers, lakes, and coastal waters that are free of pollution—is central to NRDC's mission.

13.    Plaintiff American Rivers is a national, nonprofit organization with approximately 26,000 members. American Rivers was founded in 1973 and has more than 65,000 members and supporters nationwide. Since 1973, American Rivers's mission has been to protect and restore America's rivers for the benefit of people, wildlife, and nature. As part of its mission, American Rivers seeks to protect water quality through a range of efforts to stop pollution from stormwater runoff and ensure access to clean water for urban communities.

14.    Plaintiffs bring this action on behalf of their members. Plaintiffs' memberships include individuals and families who live, work, and play in the Baltimore area, and who are unable to fully use and enjoy the Back River watershed because of water pollution.

15.    EPA's refusal to determine whether permits are necessary for discharges that are contributing to pollution in the Back River watershed perpetuates the status quo of impaired waterways in the Baltimore area. Plaintiffs' members are harmed by their inability to fully use and enjoy the waterways in the Back River watershed, and by their reasonable concerns about health risks when they do use these waterways.

16.     An order requiring EPA to fulfill its duty under the Clean Water Act to respond to Plaintiffs' petition, or directing EPA to evaluate Plaintiffs' petition based on the correct criteria, would redress those harms by making it more likely that EPA regulates these sources of pollution under the Clean Water Act.

17.     Defendant U.S. Environmental Protection Agency is the federal agency responsible for implementing the Clean Water Act.

18.     Defendant Scott Pruitt, Administrator of the U.S. Environmental Protection Agency, is the agency's highest-ranking official. He is charged with the supervision and management of all decisions and actions of the agency. Plaintiffs sue Administrator Pruitt in his official capacity.

19.     Defendant Cecil A. Rodrigues, Acting Regional Administrator of the U.S. Environmental Protection Agency's Region III office, is the highest-ranking official in the regional office responsible for overseeing the agency's activities in the state of Maryland. He is charged with supervision and management of the agency's actions in Region III. Plaintiffs sue Acting Regional Administrator Rodrigues in his official capacity.

JURISDICTION AND VENUE

20.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 33 U.S.C. § 1365(a), and 5 U.S.C. § 702.

21.     EPA's failure to make a final determination, one way or the other, in response to Blue Water Baltimore's petition is a failure to perform a nondiscretionary duty under the Clean Water Act, and is subject to judicial review. 33 U.S.C. § 1365(a)(2).

22.     EPA's denial of Blue Water Baltimore's petition is a final agency action subject to judicial review under the Administrative Procedure Act. 5 U.S.C. §§ 702, 704, 706.

23.     Plaintiffs have provided EPA with at least sixty days' written notice of the Clean Water Act violation alleged herein, in the form and manner required by law. 33 U.S.C. § 1365(b)(2); 40 C.F.R. § 135.3(b). A copy of Plaintiffs' notice letter is attached as Exhibit A to this Complaint.

24.     This Court has the authority to grant the requested declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202, 5 U.S.C. §§ 702 and 706, and 33 U.S.C. § 1365.

25.     Venue is proper in this district because plaintiff Blue Water Baltimore resides and has its principal place of business in this judicial district. 28 U.S.C. § 1391(c)(2), (e)(1).

## STATUTORY AND REGULATORY FRAMEWORK

### The Clean Water Act

26.     Congress enacted the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

27.     The Act requires EPA and delegated states to set minimum water quality standards for each body of water covered by the statute. *Id.* § 1313; 40 C.F.R. § 131.2.

28.     Water quality standards set forth the purposes for which each waterbody or segment should be used, and establish measures that ensure such uses are and will remain safe. 40 C.F.R. § 131.2.

29.     When a waterbody fails to meet water quality standards, that body is deemed "impaired."

30.     As a means of achieving water quality standards, the Act prohibits the discharge of pollutants without a permit. 33 U.S.C. §§ 1311(a), 1342, 1362(12)(A). Permits contain limitations and requirements designed to reduce pollutant discharges. *Id.* § 1342.

31.     Recognizing the serious threats to water quality posed by stormwater pollution, Congress amended the Clean Water Act in 1987 to expressly regulate stormwater discharges.

32.     The 1987 amendments mandated that EPA require permits for several types of stormwater discharges, including any "which . . . the Administrator . . . determines contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States." *Id.* § 1342(p)(2)(E).

33.     EPA promulgated regulations implementing the 1987 amendments in 1990. National Pollutant Discharge Elimination System Permit Application Regulations for Storm Water Discharges, 55 Fed. Reg. 47,990 (Nov. 16, 1990) (Phase I regulations). The regulations granted the power to any person to petition EPA to require a permit for stormwater discharges that contribute to a water quality standard violation. 40 C.F.R. § 122.26(f)(2). EPA must "make a final determination" on any such petition within ninety days of receipt. *Id.* § 122.26(f)(5).

34.     EPA promulgated a second set of regulations pursuant to the 1987 amendments in 1999. National Pollutant Discharge Elimination System—Regulations for Revision of the Water Pollution Control Program Addressing Storm Water Discharges, 64 Fed. Reg. 68,722 (Dec. 8, 1999) (Phase II regulations). The Phase II regulations clarified that the permit obligation set forth in 33 U.S.C. § 1342(p)(2)(E) applies with equal force where the Administrator determines that a category of discharges, as opposed to an

individual discharge, is contributing to water quality violations in a watershed. 40 C.F.R.

§ 122.26(a)(9)(i)(D); 64 Fed. Reg. at 68,781-82.

The Administrative Procedure Act

35.     Under the Administrative Procedure Act (APA), a reviewing court shall

"hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

36.     An agency decision is unlawful under the APA "if the agency has relied on

factors which Congress has not intended it to consider," has "entirely failed to consider an

important aspect of the problem," has "offered an explanation for its decision that runs

counter to the evidence before the agency," or "is so implausible that it could not be

ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*

*v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Stormwater Pollution

37.     Stormwater runoff occurs when water from rainfall or melted snow contacts

impervious surfaces like roads, parking lots, roofs, and other paved areas. Unlike natural

ground cover, these surfaces cannot absorb water.

38.     As water runs over these surfaces, it picks up pollutants and debris, including

oil, metals, pesticides, trash, and sediments. It then flows, untreated, either directly or

through storm sewers, into local waterbodies.

39.     Stormwater runoff is one of the largest sources of water pollution in the

nation. It elevates contaminant concentrations, reduces water quality, alters and destroys

habitat, and makes waterways unsafe for their designated uses.

40.     Nutrient over-enrichment from nitrogen and phosphorus is a common consequence of stormwater pollution. Nitrogen and phosphorus in stormwater can lead to excessive algae growth, which can decrease dissolved oxygen levels in waterways and drive out plant and animal life.

41.     Sediment in stormwater also has significant environmental impacts. It can harm fish and macroinvertebrate communities by decreasing light penetration in streams, smothering fish eggs, and transporting other pollutants like nutrients and metals.

42.     The impacts of stormwater pollution are particularly severe in urban areas, where impervious surfaces cover high percentages of land. There is a direct relationship between high levels of impervious cover in a watershed and decreased water quality in downstream waterways.

43.     Stormwater runoff is a leading cause of water pollution in the Baltimore area.

44.     Baltimore waterways regularly violate water quality standards for nitrogen, phosphorus, and sediment—all pollutants that are consistently present in large quantities in stormwater discharges.

The Back River Watershed

45.     The Back River flows through a highly urbanized watershed in Baltimore City and Baltimore County. The watershed drains an area of 61 square miles in the western shore region of Maryland, northeast of the Baltimore Harbor, emptying into the Chesapeake Bay.

46.     The Back River is home to several marinas and waterfront parks, including Cox's Point Park and Rocky Point Park. The river is a popular spot for picnicking, boating, fishing, and windsurfing.

47.     The Back River's tributaries, including Herring Run, are also common areas for recreation. For instance, the Herring Run Trail runs along the water through a wooded park, and is a popular area for bird watching and hiking.

48.     Despite its popularity, the Back River is badly polluted by nutrients like nitrogen and phosphorus, sediment, and other contaminants. The entire Back River watershed is currently impaired by nitrogen, phosphorus, and sediment. As a result, the Back River and its tributary streams are not suitable for their designated uses, which include recreation, fishing, and aquatic and wildlife uses.

Stormwater Discharges from Commercial, Industrial, and Institutional Sites

49.     Commercial, industrial, and institutional (CII) sites are prevalent in urban areas, including in the Back River watershed.

50.     Commercial sites include retail stores, malls, and office buildings. Industrial sites include manufacturing and industrial parks, warehouses, storage yards, and laboratories. Institutional sites include hospitals, schools, and universities.

51.     CII sites have large areas of impervious surfaces that accumulate pollutants. When water runs over these impervious surfaces, the pollutants become mobilized.

52.     The density of impervious surfaces at CII sites causes these sites to generate greater volumes of polluted stormwater runoff than most other types of land use.

53.     Runoff from CII sites consistently contains high levels of nitrogen, phosphorus, and sediment. These sites contribute pollutants to waterways at levels many times higher than those from undeveloped land.

54.     The portions of industrial sites that are actively used for industrial purposes are covered by Clean Water Act permits, but the portions of those sites occupied by office

buildings or parking lots are not. CII sites are otherwise typically not required to obtain Clean Water Act permits for stormwater runoff.

55.     CII sites occupy approximately 22% percent of the land in the Back River watershed.

Blue Water Baltimore's Petition

56.     On September 17, 2015, Blue Water Baltimore petitioned EPA for a determination that stormwater discharges from CII sites contribute to violations of water quality standards in the Back River watershed, and therefore require Clean Water Act permits.

57.     Blue Water Baltimore's petition provided evidence that stormwater discharges from CII sites contain elevated levels of nitrogen, phosphorus, and sediment, and that discharges from these sites contribute to water quality impairments in the Back River watershed.

58.     Although Blue Water Baltimore maintained that other stormwater regulatory programs are irrelevant to the question whether permits are required, the petition also presented evidence that ongoing stormwater control programs are not adequately addressing pollution from CII discharges.

59.     Over a year later, EPA responded to Blue Water Baltimore's petition.

60.     In its response to the petition, EPA stated that it considered three factors: (1) the likelihood that pollutants are exposed to precipitation at sites in the categories identified in the petition; (2) the sufficiency of the data indicating that stormwater discharges from the identified categories of sites contribute to water quality impairment; and

(3) "[w]hether other federal, state, or local programs adequately address the known stormwater discharge."

61.     EPA also stated that it considered additional "administrative and policy factors," including "resources, workload, and [Maryland's] preferred means of addressing stormwater-related pollution."

62.     EPA denied Blue Water Baltimore's petition without making a determination whether stormwater discharges from CII sites in the Back River watershed contribute to the watershed's nitrogen, phosphorus, and sediment violations. Instead, it based its denial on the conclusion that CII discharges are "controlled by other [Clean Water Act] programs" and "requir[ing] stormwater permits for unregulated CII stormwater discharges is not warranted and would be an inefficient use of already limited resources."

63.     Although factors (1) and (2) above are relevant to a determination whether the discharges at issue are contributing to violations of water quality standards, the other factors considered by EPA are not. The only relevant criterion presented in 33 U.S.C. § 1342(p)(2)(E) and its implementing regulations is whether the discharges at issue are contributing to water quality violations in the named watershed. That is the sole criterion that EPA was authorized to consider in evaluating Blue Water Baltimore's petition.

64.     Even if EPA could properly consider other factors, existing programs are not adequately addressing pollution from CII sites.

65.     None of the existing programs in the Back River watershed have adequately controlled pollution from CII sources to date.

66.     None of the existing programs in the Back River watershed have been demonstrated to be sufficient to achieve compliance with water quality standards.

67.     None of the existing programs in the Back River watershed obligate the owners or operators of existing CII sites to reduce stormwater discharges. Instead, local governments bear the burden of cleaning up the Back River watershed.

68.     Local governments in the Back River watershed to date have been unable to carry out existing programs in accordance with legal requirements.

69.     Even if existing programs work exactly as designed, EPA projects the Upper Back River will continue to violate water quality standards until 2028.

FIRST CLAIM FOR RELIEF

70.     Plaintiffs incorporate by reference all preceding paragraphs.

71.     The Clean Water Act and its implementing regulations identify stormwater discharges for which "operators *shall be required* to obtain" a Clean Water Act permit. 40 C.F.R. § 122.26(a)(9)(i) (emphasis added). Discharges or categories of discharges that EPA determines are contributing to violations of water quality standards must be regulated by permits. 33 U.S.C. § 1342(p)(2)(E); 40 C.F.R. § 122.26(a)(9)(i)(D).

72.     Once a member of the public submits a petition seeking a determination that a category of discharges contributes to a violation of a water quality standard and requires permitting, EPA must respond either by concluding that the referenced discharges are contributing to violations of water quality standards and require permits; or by concluding that the referenced discharges are not contributing to violations of water quality standards and do not require permits.

73.     EPA cannot duck the question because it would prefer to take a different policy approach.

13

74.     EPA's refusal to determine whether CII discharges in the Back River watershed meet the requirements for permitting under the Clean Water Act violates 33 U.S.C. §§ 1311(a) and 1342(p) and 40 C.F.R. § 122.26(a)(9)(i)(D) and (f)(5) and constitutes a failure to perform a nondiscretionary duty, 33 U.S.C. § 1365(a)(2).

75.     This violation has harmed and continues to harm Blue Water Baltimore's members.

## SECOND CLAIM FOR RELIEF

76.     Plaintiffs incorporate by reference all preceding paragraphs.

77.     EPA unlawfully denied Blue Water Baltimore's petition when it based that denial on existing programs that are irrelevant under the Clean Water Act to the determination whether discharges from CII sources must be regulated.

78.     EPA's denial of Blue Water Baltimore's petition relies on a factor that Congress did not authorize it to consider, and is therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

79.     EPA's denial of Blue Water Baltimore's petition has harmed and continues to harm Blue Water Baltimore's members.

## THIRD CLAIM FOR RELIEF

80.     Plaintiffs incorporate by reference all preceding paragraphs.

81.     In the alternative, EPA unlawfully denied Blue Water Baltimore's petition when it based that denial on the adequacy of existing programs that are unlikely to achieve water quality standards.

82.     EPA's denial of Blue Water Baltimore's petition offers an explanation for the agency's decision that runs counter to the evidence, and is therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

83.     EPA's denial of Blue Water Baltimore's petition has harmed and continues to harm Blue Water Baltimore's members.

REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment as follows:

A.     Declaring that EPA's failure to answer the question presented by Plaintiffs' petition violates the Clean Water Act, and directing EPA to make a prompt, final determination, one way or the other, on whether CII discharges contribute to violations of water quality standards in the Back River watershed;

B.      Declaring that EPA's denial of Blue Water Baltimore's petition violated the APA, and (1) directing the agency to make the determination prompted by that petition in accordance with the criterion authorized under the Clean Water Act; or (2) directing the agency to make the determination prompted by that petition in accordance with the evidence presented in the record.

C.     Awarding Plaintiffs their costs and reasonable attorneys' fees; and

D.     Granting such other relief that the Court considers just and proper.

Respectfully submitted,

_____/s/_____
Jared E. Knicley (Bar No. 18607)
Sarah V. Fort (pro hac vice motion pending)
Aaron Colangelo (pro hac vice motion pending)
Nancy S. Marks (pro hac vice motion pending)
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005

15

jknicley@nrdc.org
sfort@nrdc.org
acolangelo@nrdc.org
nmarks@nrdc.org
Telephone: (202) 513-6242
Fax: (415) 795-4799

Dated: May 8, 2017