IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BLUE WATER BALTIMORE, INC., et al.,   :

    Plaintiffs,   :

v.   :   Civil Action No. GLR-17-1253

ANDREW WHEELER,[1] et al.,   :

    Defendants.   :

## MEMORANDUM OPINION

THIS MATTER is before the Court on Plaintiffs Blue Water Baltimore, Inc., Natural Resources Defense Council, and American River's Motion for Summary Judgment (ECF No. 38) and Defendants Andrew Wheeler, Cosmo Servidio,[2] and the U.S. Environmental Protection Agency's ("EPA" or "the Agency") Cross-Motion for Summary Judgment (ECF No. 39). This case arises from EPA's November 3, 2016 denial of Plaintiffs' Petition for a Determination that Stormwater Discharges from Commercial, Industrial, and Institutional Sites Contribute to Water Quality Standards Violations in the Back River Watershed[3] (Baltimore, Maryland) and Require Clean Water Act Permits (the "Petition"). The Motions are ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2018). For the reasons outlined below, the Court will grant Plaintiffs' Motion and deny Defendants' Cross-Motion.

---

[1] On February 29, 2019, the U.S. Senate confirmed Wheeler as EPA Administrator. Accordingly, the Court substitutes Wheeler for Scott Pruitt. See Fed.R.Civ.P. 25(d).
[2] During this case, Servidio became EPA Regional Administrator for Region III. Accordingly, the Court substitutes Servidio for Cecil Rodrigues. See Fed.R.Civ.P. 25(d).
[3] The Back River and its tributaries flow through a heavily populated area of Eastern Baltimore City and Baltimore County before emptying into the Chesapeake Bay.

## I. BACKGROUND[4]

On September 17, 2015, Plaintiffs petitioned EPA under 40 C.F.R. § 122.26(f)(2) (2018). (Compl. ¶ 33; Joint Appendix ["J.A."] Ex. VI at 75–106, ECF No. 45-6).[5] Plaintiffs asked EPA to determine whether "stormwater discharges from privately-owned commercial, industrial, and institutional [("CII")] sites are contributing to violations of water quality standards in the Back River watershed." (J.A. Ex. VI at 76). On November 3, 2016, EPA denied Plaintiffs' Petition. (Id. at 119–39). EPA based its decision on three factors: (1) the "[l]ikelihood of exposure of pollutants to precipitation at sites in the categories identified in the [P]etition"; (2) the "[s]ufficiency of available data to evaluate the contribution of stormwater discharges to water quality impairment from the [CII sites]"; and (3) "[w]hether other federal, state, or local programs adequately address the known stormwater discharge." (Id. at 126). EPA also considered "resources, workload, and [Maryland's] preferred means of addressing stormwater-related pollution." (Id.).

On May 8, 2017, Plaintiffs sued Defendants alleging: a violation of the Clean Water Act (the "CWA"), 33 U.S.C. § 1365(a)(2) (2018) (Count I); and two violations of the Administrative Procedure Act (the "APA"), 5 U.S.C. § 706(2)(A) (2018) (Counts II–III). (Compl. ¶¶ 70–83). Count II alleges that EPA's denial of the Petition was arbitrary and

---

[4] Unless otherwise noted, the facts outlined here are set forth in Plaintiffs' Complaint (ECF No. 1). To the extent the Court discusses facts that Plaintiffs do not allege in their Complaint, they are uncontroverted and the Court views them in the light most favorable to the non-moving party. The Court will address additional facts when discussing applicable law.

[5] Citations to the Joint Appendix refer to the pagination the Court's Case Management and Electronic Case Files ("CM/ECF") system assigned.

capricious because it relied on a factor that Congress did not authorize it to consider. (Id. ¶ 78). Count III, which is pled in the alternative, alleges that EPA's denial of the Petition was arbitrary and capricious because the decision ran counter to the evidence before the Agency. (Id. ¶¶ 81–82). Plaintiffs seek a declaration that EPA violated the CWA and the APA, and an order directing EPA to determine "whether CII discharges contribute to violations of water quality standards in the Back River watershed." (Id. at 15). On February 5, 2018, the Court granted Defendants' Motion to Dismiss Count I of the Complaint. (ECF No. 20). As a result, only Plaintiffs' APA Counts remain.

Plaintiffs filed their Motion for Summary Judgment on June 25, 2018. (ECF No. 38). On August 6, 2018, Defendants filed an Opposition and Cross-Motion for Summary Judgment. (ECF No. 39). On September 4, 2018, Plaintiffs filed a Reply. (ECF No. 40). On September 21, 2018, Defendants filed a Reply. (ECF No. 41).[6]

## II. DISCUSSION

### A. Standard of Review

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A district court properly decides APA claims on summary judgment because the facts are contained in the administrative record and are undisputed. Citizens for the Scenic Severn River Bridge, Inc. v. Skinner, 802 F.Supp. 1325, 1332 (D.Md. 1991)

---

[6] On October 25, 2018, the Court granted a Joint Motion for Leave to File a Joint Appendix. (ECF No. 44). On November 20, 2018, the parties filed the Joint Appendix, which contains the portions of the administrative record parties cite in their motions. (ECF No. 45).

3

aff'd sub nom. Citizens for Scenic Severn River Bridge, Inc. v. Skinner, 972 F.2d 338 (4th Cir. 1992). The district court decides as a matter of law, "whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." Red Wolf Coal. v. U.S. Fish & Wildlife Serv., 346 F.Supp.3d 802, 809 (E.D.N.C. 2018) (quoting Sierra Club v. Mainella, 459 F.Supp.2d 76, 90 (D.D.C. 2006)).

Under the APA, the Court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). An agency decision is arbitrary and capricious if:

> the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Ohio River Valley Envtl. Coal., Inc. v. Kempthorne, 473 F.3d 94, 102 (4th Cir. 2006) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

**B. Analysis**

    **1. Plaintiffs' Motion for Summary Judgment**

Plaintiffs allege that EPA acted arbitrarily and capriciously because: (1) it improperly considered whether other federal, state, or local programs adequately address stormwater discharge from private CII sites; and, in the alternative, (2) EPA's conclusion that existing programs adequately address the stormwater discharges at issue runs counter to the evidence before the Agency. Countering Plaintiffs' first contention, Defendants

advance three main arguments: (1) EPA may consider existing programs because the text of the CWA does not delineate the factors that EPA must consider before issuing permits under 33 U.S.C. § 1342(p)(2)(E); (2) EPA's interpretation of the CWA—that Congress did not preclude its consideration of existing programs—is entitled to Chevron[7] deference; and (3) 33 U.S.C. § 1342(p)(6) expands EPA's discretion in this area. Countering Plaintiffs' second contention, Defendants maintain that EPA's conclusion was supported by the evidence before it. The Court agrees with Plaintiffs that EPA acted arbitrarily and capriciously when it improperly considered other programs' efforts to address CII sites.

### a. CWA Permitting Program

In 1972, Congress amended the Federal Water Pollution Control Act of 1948—creating the CWA—"to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a) (2018). To that end, 33 U.S.C. § 1311(a) prohibits "the discharge of any pollutant" unless the discharge is covered by an exception. One such exception is the National Pollutant Discharge Elimination System ("NPDES") permitting program set out in § 1342. Section 1342(a) provides that, under certain conditions, "the Administrator may . . . issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section 1311(a)."[8] This

---

[7] Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984).
[8] As the U.S. Court of Appeals for the District of Columbia Circuit held, "may" in this section "means only that the Administrator has discretion either to issue a permit or to leave the discharger subject to the total proscription of" § 1311(a). Nat. Res. Def. Council, Inc. v. Costle, 568 F.2d 1369, 1375 (D.C. Cir. 1977).

5

combination of provisions established a prohibit-or-permit regime with respect to water pollutant regulation.

In 1987, to further the CWA's goals, Congress passed the Water Quality Act (the "WQA"), which added 33 U.S.C. § 1342(p) to the CWA as codified. Water Quality Act of 1987, Pub. L. No. 100-4, § 405, 101 Stat. 7 (1987). Section 1342(p)(1) established a moratorium on requiring permits for stormwater discharges through 1994. For that seven-year period, stormwater discharges were neither subject to the total proscription of § 1311(a) nor the permitting program set out in § 1342. The moratorium was subject to several exceptions, however, set forth in § 1342(p)(2) of the CWA. Because they were exceptions to a moratorium on the pre-WQA prohibit-or-permit regime, these excepted categories of discharges must be either permitted or prohibited.

Plaintiffs brought their Petition under the exception found in § 1342(p)(2)(E). (J.A. Ex. VI at 76 n.1, 83 n.46, 98 n.137; Compl. ¶ 6; Mem. P. & A. Supp. Pls.' Mot. Summ. J. ["Pls.' Mot."] at 10, ECF No. 38-1). This exception covers, in relevant part, any stormwater discharge that the Administrator "determines . . . contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States." § 1342(p)(2)(E).

### b. Chevron Deference

As a threshold matter, Defendants contend that EPA's interpretation of the CWA is entitled to Chevron deference, and therefore the Court should defer to its determination that it could consider other federal, state, and local programs. The Court disagrees. An agency's interpretation of a statute is entitled to Chevron deference only if the statute is

ambiguous or silent as to the question at issue. Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842–44 (1984). Here, the statute is not silent or ambiguous. As explained above, the statute directs EPA to determine whether the discharges at issue "contribute[ ] to a violation of a water quality standard or [are] a significant contributor of pollutants to waters of the United States." § 1342(p)(2)(E). If they do, EPA must either issue a permit for those discharges or prohibit them entirely. L.A. Waterkeeper v. Pruitt, 320 F.Supp.3d 1115, 1123 (C.D.Cal. 2018). Congress left no gap in the statute that would allow EPA interpretive room to consider the effect of programs that do not determine whether the relevant stormwater discharges contribute to water quality violations.[9] EPA's interpretation is, therefore, not entitled to deference.

### c. L.A. Waterkeeper v. Pruitt

While the parties were briefing their Motions before the Court, the U.S. District Court for the Central District of California ruled on cross-motions for summary judgment in a case with issues that significantly overlap with those in this case, L.A. Waterkeeper, 320 F.Supp.3d at 1123–25. In L.A. Waterkeeper, EPA considered the same three factors as the Agency did in this case, (compare L.A. Waterkeeper, 320 F.Supp.3d at 1120, with J.A. Ex. VI. at 126), and the plaintiffs in that case brought the same APA "arbitrary and

---

[9] EPA argues its consideration of existing programs in response to Plaintiffs' Petition was reasonable and entitled to Chevron deference. (Mem. P. & A. Supp. Defs.' Cross-Mot. Summ. J. ["Defs'. Mot."] at 16–18, ECF No. 39). EPA cites to 64 Fed. Reg. 68,780 as an example of its "long-standing interpretation." But this citation comes from EPA's final rule for small municipal separate storm sewer systems ("MS4s"), implemented under § 1342(p)(6). Accordingly, it has no bearing on the factors that may permissibly ground EPA's decision under § 1342(p)(2)(E).

capricious" claims as Plaintiffs do here, (compare Complaint ¶¶ 86–91, L.A. Waterkeeper, 320 F.Supp.3d 1115 (ECF No. 1, No. 2:17-cv-3454-SVW-KS), with Compl. ¶¶ 76–83).

In L.A. Waterkeeper, EPA determined "there are sufficient data available to demonstrate that stormwater discharges are contributing to water quality impairments in the [watersheds at issue]" but then declined to permit or prohibit those discharges. 320 F.Supp.3d at 1123.[10] To answer the question of whether EPA considered an improper factor—the effect of existing programs—the L.A. Waterkeeper Court began its analysis with Massachusetts v. EPA, 549 U.S. 497 (2007). 320 F.Supp.3d at 1124.

In Massachusetts, the Supreme Court held that EPA's refusal to decide whether greenhouse gases caused or contributed to climate change was arbitrary and capricious. 549 U.S. at 534–35. The Clean Air Act (the "CAA") provision at issue in Massachusetts states that the EPA Administrator shall prescribe emissions standards for air pollutants which "in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7521(a)(1) (2018). Massachusetts held that, "by the clear terms of the [CAA]" EPA may refuse to act "only if it determines that greenhouse gases do not contribute to climate change or if it provides some reasonable explanation as to why it cannot or will not exercise its discretion to determine whether they do." Massachusetts, 549 U.S. at 533. Massachusetts further clarified that EPA's "laundry list of reasons not to regulate," including that various

---

[10] The L.A. Waterkeeper Court concluded that leaving those discharges unregulated violated the CWA and that "[d]eclining to engage in the permitting process . . . was therefore arbitrary and capricious because it was contrary to law." 320 F.Supp.3d at 1123.

programs already addressed the threat of climate change, "have nothing to do with whether greenhouse gas emissions contribute to climate change. Still less do they amount to a reasoned justification for declining to form a scientific judgment." Id. at 533–34. EPA must, in other words, tether its reasons for "action or inaction" to the statute, which calls for a scientific judgment. Id. at 534–35.

Because the CAA provisions at issue in Massachusetts and the CWA provisions at issue in L.A. Waterkeeper are similarly structured, the L.A. Waterkeeper Court concluded that the Supreme Court's commands to EPA in Massachusetts applied with equal force in that case. 320 F.Supp.3d at 1124–25. Just as EPA's reasons for declining to regulate emissions of air pollutants needed to be grounded in the text of 42 U.S.C. § 7521(a), EPA's reasons for declining to engage in the permitting process for stormwater discharges needed to be grounded in the text of 33 U.S.C. § 1342(p)(2)(E). As the L.A. Waterkeeper Court explained, "EPA's reasons for declining to issue permits must relate to whether the stormwater at issue contributes to a violation of a water quality standard," per § 1342(p)(2)(E)'s direction. Id. at 1125. The L.A. Waterkeeper Court concluded that, because the defendants in that case did not identify a CWA provision "that indicates that EPA may consider whether other federal, state, or local programs adequately address the known stormwater discharge contribution to a violation of water quality standards," EPA considered a factor "divorced from the statutory text," id. (quoting Massachusetts, 549 U.S. at 532), and "acted arbitrarily and capriciously," id. The same logic applies here.

Plaintiffs petitioned EPA to determine whether stormwater discharges from privately-owned CII sites contribute to violations of water quality standards. (J.A. Ex. VI

9

at 75–106). EPA must, therefore, base its decision on whether stormwater discharges from CII sites contribute to violations of water quality standards. § 1342(p)(2)(E); Massachusetts, at 534–35; cf. United States v. Divens, 650 F.3d 343, 349–50 (4th Cir. 2011) (citing Massachusetts, 549 U.S. at 533–34) (holding that a criminal sentencing guideline "requires the Government to consider the specific factors articulated in the guideline itself, not some other criterion that it believes to be 'closely related' to the textual requirement"). As in Massachusetts, this is a scientific inquiry, 549 U.S. at 534, the answer to which is guided and limited by the text of the statute, Divens, 650 F.3d at 349.

Here, as in L.A. Waterkeeper, EPA considered three factors before denying Plaintiffs' Petition: (1) the "[l]ikelihood of exposure of pollutants to precipitation at sites in the categories identified in the petition"; (2) the "[s]ufficiency of available data to evaluate the contribution of stormwater discharges to water quality impairments from the targeted categories"; and (3) "[w]hether other federal, state, or local programs adequately address the known stormwater discharge." (J.A. Ex. VI at 126).

As to the first factor, EPA concluded that pollutants are likely exposed to precipitation at CII sites, noting that "there exists an observable link between urban water impairments and impervious surfaces." (Id. at 127, 138). As to the second factor, EPA concluded that this link between impervious surfaces and water impairments is, by itself, an insufficient basis for determining whether stormwater discharges from CII sites contribute to violations of water quality standards. (Id. 127). EPA did not, however, conclude that there was insufficient data to determine whether stormwater discharges from CII sites contribute to violations of water quality standards. (Id. 127–31); cf. Masschusetts,

10

549 U.S. at 534 ("If the scientific uncertainty is so profound that it precludes EPA from making a reasoned judgment[,] . . . EPA must say so. That EPA would prefer not to regulate . . . because of some residual uncertainty . . . is irrelevant."). EPA ultimately denied Plaintiffs' Petition based on the third factor, concluding that existing programs adequately address stormwater discharge from CII sites. (Id. at 119).

The first two factors are permissible bases for EPA's denial because they relate to the scientific determination of whether stormwater discharges from CII sites contribute to violations of water quality standards. The third factor, however, is unrelated to this scientific inquiry and is, therefore, "divorced from the statutory text." Massachusetts, 549 U.S. at 532.

Plaintiffs acknowledge that EPA may consider data from existing programs, but only for the purpose of determining whether the discharges from the CII sites at issue contribute to water quality violations. Unless these programs prevent such contributions altogether or reduce them to de minimis amounts, they cannot justify the Agency's decision not to issue a permit. In its denial of Plaintiff's Petition, EPA did not conclude that stormwater discharges from CII sites do not contribute to violations of water quality standards because of existing programs. Instead, EPA demurred from answering the scientific question posed by the text of § 1342(p)(2)(E)—whether the stormwater discharges at issue contribute to violations of water quality standards—because it apparently preferred to address the environmental impacts of stormwater discharges through existing programs. This EPA may not do. See Nat. Res. Def. Council, Inc. v. FDA., 760 F.3d 151, 191 (2d Cir. 2014) (Katzmann, J., dissenting) ("[T]he [FDA's] discretion is limited to making the

determination required by [21 U.S.C. § 360(b)]; it cannot refuse to make that determination just because it would prefer a different regulatory strategy than the statute specifies.").

Defendants' isolate a pair of lines from Massachusetts to support their position, but the Court is not persuaded. First, Massachusetts stated that "EPA can avoid taking further action only if it determines that greenhouse gases do not contribute to climate change or if it provides some reasonable explanation as to why it cannot or will not exercise its discretion to determine whether they do." 548 U.S. at 533. Defendants argue that consideration of existing programs is a "reasonable explanation." But Massachusetts expressly rejected this argument. Massachusetts concluded that the "laundry list of reasons" EPA offered in declining to regulate greenhouse gases, including that various Executive Branch programs "already provide an effective response to the threat of global warming, . . . have nothing to do with whether greenhouse gas emissions contribute to climate change. Still less do they amount to a reasoned justification for declining to form a scientific judgment." Id. at 533–34. Here, too, EPA's reliance on existing programs does not amount to a reasoned justification for failing to determine whether stormwater discharges from CII sites contribute to violations of water quality standards. In other words, Plaintiff's Petition asked about "cause," but the Agency's answer addressed "effect."

Second, Defendants rely on the Massachusetts Court's decision not to reach the question of whether EPA may consider policy concerns "in the event that it makes [an endangerment finding]." Id. at 534–35. But the Court's abstention on that point does not mean that EPA may consider policy concerns in making an endangerment finding, or in this case, in determining whether stormwater discharges from CII sites contribute to

12

violations of water quality standards. Instead, the Massachusetts Court merely left unaddressed the question of whether policy concerns can inform EPA's actions after it forms the scientific judgment that the text of the statute demands. The Massachusetts Court's conclusion remains clear: EPA must "ground its reasons for action or inaction in the statute." Id. at 535.

Defendants next advance two arguments about the text of § 1342(p), but they, too, are unpersuasive. First, Defendants argue that the text of § 1342(p)(2)(E) merely sets forth factual prerequisites that must be established before EPA exercises its discretion to issue permits, rather than factors that must form the basis of EPA's decision. This argument does not hold water in light of Massachusetts' holding. Under Massachusetts, EPA must base its action or inaction on § 7521(a)(1)'s "cause, or contribute to, air pollution" language. 549 U.S. at 532–35. In other words, EPA may only decline to regulate if it answers this scientific question in the negative or concludes that there is insufficient information to make this determination. Id. Here, too, EPA must anchor its decision to the text of § 1342(p)(2)(E).

Next, Defendants argue that 33 U.S.C. § 1342(p)(6) expands the potential permissible bases for EPA's decision. The Court disagrees. Sections 1342 (p)(2) and (p)(6) are mutually exclusive. Section 1342(p)(6) directs EPA to issue regulations designating stormwater discharges "other than those discharges described in" § 1342(p)(2). 33 U.S.C. § 1342(p)(6). Plaintiffs' Petition asked EPA to determine whether stormwater discharges from CII sites "contribut[e] to violations of water quality standards"—the language of

13

§ 1342(p)(2)(E). (J.A. Ex. VI at 76).[11] For EPA's denial of Plaintiffs' Petition to clear the arbitrary and capricious hurdle, therefore, EPA must ground its determination in the text of § 1342(p)(2)(E).

Thus, the Court concludes that EPA acted arbitrarily and capriciously in considering this impermissible factor. L.A. Waterkeeper, 320 F.Supp.3d at 1123–25; Nat. Res. Def. Council, 760 F.3d at 190–92 (Katzmann, J., dissenting); cf. Divens, 650 F.3d at 349–50. Accordingly, the Court will grant Plaintiffs' Motion on Count II.

Because the Court concludes that EPA acted arbitrarily and capriciously in the manner alleged in Count II, the Court does not reach Plaintiffs' alternative allegations in Count III.

### 2. Defendants' Cross-Motion for Summary Judgment

As noted above, the facts of this case are not in dispute. Skinner, 802 F.Supp. at 1332. The parties present purely legal issues for the Court's consideration. As reasoned above, § 1342(p)(2)(E) delineates the bases upon which EPA may decide to act. Because EPA considered a factor "divorced from the statutory text" it acted arbitrarily and

---

[11] The footnote to that sentence of the Petition cites, after § 1342(p)(2)(E), "(p)(6)" and associated regulations. (J.A. Ex. VI at 78 n.1). That is the Petition's only citation to § 1342(p)(6). The Petition references § 1342(p)(2)(E) twice more in support of its argument that the Agency should regulate. (J.A. Ex. VI at 83 n.46, 98 n.137). In sum, the Petition directs the Agency's attention to its authority and responsibility under § 1342(p)(2)(E), and the Agency considered the discharges at issue under § 1342(p)(2)(E). Having done so, the Agency cannot now contend that another section of the statute—that explicitly governs different stormwater discharges—gives it discretion not to answer the § 1342(p)(2)(E) question.

capriciously. <u>Massachusetts</u>, 549 U.S. at 534. Accordingly, the Court will deny Defendants' Motion as to Count II and Count III.

### III. CONCLUSION

For the foregoing reasons, the Court will grant Plaintiffs' Motion for Summary Judgment (ECF No. 38) and deny Defendants' Cross-Motion for Summary Judgment (ECF No. 39). The Court will vacate EPA's denial of Plaintiff's Petition and remand this matter to EPA for further proceedings consistent with this Memorandum Opinion. A separate Order follows.

Entered this 22nd day of March, 2019.

Very truly yours,

/s/
George L. Russell, III
United States District Judge